IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATE LINDELL,

                       Plaintiff,

    v.

PETER MORENO, JENNIFER FANDEL,
MICHAEL GLASS, NATHAN KENNEDY,
and ANTHONY CHURCHILL,

                    Defendants.

OPINION and ORDER

23-cv-811-jdp

---

Plaintiff Nate Lindell, a state of Wisconsin prisoner proceeding without counsel, was removed from educational programming and barred from being in the same building as a teacher soon after Lindell and another inmate had a verbal altercation in class. Lindell brings First Amendment claims against Department of Corrections and University of Wisconsin employees whom he alleges retaliated against him for complaining about being harassed by the other inmate. Both the corrections defendants and the UW defendants move for summary judgment. Dkt. 43 and Dkt. 51. For the reasons stated below, I will grant those motions and dismiss the case. I will also address a series of other motions.

PRELIMINARY MATTERS

After summary judgment briefing was completed, Lindell moved to submit additional evidence concerning defendant Nathan Kennedy's termination by the DOC for misconduct and to submit a sur-reply addressing what he believes were arguments raised for the first time in the UW defendants' reply brief. Dkt. 130 and Dkt. 131. I will grant those motions and I will consider Lindell's new filings. But they ultimately do not affect the outcome here.

Kennedy's termination was for misconduct unrelated to the events of this case. Also, I do not agree with Lindell that the UW defendants raised new issues in their reply brief, and in any event his sur-reply arguments do not change my analysis below.

Lindell moves to sanction defendants for what he believes is perjury in their declarations and other misconduct. Because he seeks entry of judgment in his favor as a sanction, I will address this motion before addressing defendants' motion for summary judgment.

Lindell argues that in their declarations defendants discuss alleged misconduct on his part, but that the misconduct could not have happened because they did not file conduct or incident reports about it as is required under DOC rules. He disagrees with defendants' account of events and their stated rationales for the actions they took. He also contends that counsel for both sets of defendants conducted litigation in bad faith by submitting defendants' declarations with the above alleged defects, and he accuses counsel for the corrections defendants of concealing evidence concerning defendant Kennedy's termination of DOC employment for misconduct (evidence that Lindell submits in sur-reply).

I will deny Lindell's motion for sanctions. What he describes is not sanctionable misconduct but rather his disagreement about the underlying events of the case, a run-of-the-mill occurrence in litigation. People's memories of events can change over time, and a lack of corroborating evidence might harm a witness's credibility, but those aren't reasons for sanctions. Nothing in his submissions suggests that defendants or their counsel have acted in bad faith. I need not address in detail Lindell's allegations that counsel for the corrections defendants concealed records regarding Kennedy's termination because (1) Lindell was able to submit those materials in sur-reply; and (2) those materials are ultimately immaterial to my analysis of his claims at the summary judgment stage.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Nate Lindell was an inmate at Columbia Correctional Institution (CCI) at the times relevant to this case. The corrections defendants all worked at CCI: Nathan Kennedy was the education director, Anthony Churchill was a teacher, and Michael Glass was a restrictive housing unit manager and he later became CCI's deputy warden.

This case involves a prison educational program called Odyssey Beyond Bars (OBB), a community project through UW–Madison intended to give people the opportunity to try college. Defendant Peter Moreno and Jennifer Fandel were employed by UW–Madison; Moreno was the academic program director for OBB, and Fandel was teaching faculty.

Fandel came to CCI once a week to teach English 100. Lindell was enrolled in that class in spring 2022, as was another inmate named Eric Gallup. Lindell states that Gallup repeatedly harassed him during this class, often calling Lindell a communist. In mid-March 2022, Lindell sent Fandel an electronic message over OBB's software application stating in part that he didn't like condescending jokes made by another student (I take him to mean Gallup) and asking Fandel to tell the class to "refrain from making disrespectful, condescending, or inconsiderate remarks." Dkt. 46-1, at 12. Fandel replied, stating that she would watch for those remarks and that she might say something to the class about it. Lindell states that Fandel did not say anything to the class about it.

In May 2022, Lindell included in his end-of-the-course self-reflection paper statements that he was frustrated by inmates wasting long stretches of class with irrelevant monologues and that he had to warn Gallup about intentionally mispronouncing his name in class. Fandel

3

taught a non-credit poetry class in the summer, which Lindell did not take. Lindell says that he made Fandel aware that he didn't want to take that class because Gallup would be in it.

Fandel offered to all students who completed English 100 the opportunity to participate in an "editorial group" in summer 2022; the participants would edit student-inmate work for an internal prison publication and discuss their work. Gallup was in the group. Lindell joined the group midsummer and stayed on for the fall semester. Lindell states that he complained several times to Fendel in person about Gallup's behavior. Fandel denies that Lindell complained to her.

On November 14, 2022, there was an incident involving Lindell and Gallup. Gallup loudly spoke about an issue irrelevant to the class "about how stupid a professor was who believed that only White people could be racist." Dkt. 99, ¶ 64. Lindell asked if there was going to be a discussion about editorial-group business, and Gallup replied, "No." *Id.* Lindell said that Gallup's remarks could be offensive to another of the inmates present, who was black. Fandel added that what Gallup was saying sounded racist. Gallup told Lindell, "If you don't like what I'm saying, turn your chair around." *Id.* The parties dispute whether defendant Churchill was in the classroom for this incident: Lindell says he was, Fandel says that Churchill was just outside the classroom and that she looked at him when the conversation got heated to get him to join them. At the end of class, Gallup approached Lindell for a hug. Fandel says that Lindell accepted the hug. Lindell says that Gallup forced the hug on him.

The next day, Lindell sent Fandel an electronic message stating that Gallup's history of misbehavior and harassment of Lindell was causing a hostile environment, that he didn't want Gallup's hug, and that "[i]f there are any more gratuitous, hostile, degrading remarks made by

[Gallup] about any group (e.g. lesbians, Blacks, Muslims, etc.), please let Mr. Moreno know that I will be pursuing legal action." Dkt. 46-1, at 6.

Fandel corresponded with others, including Moreno, Kennedy, and Churchill, about how to respond to this message and the threat of being sued. Moreno suggested that they'd likely have to dissolve the editorial group if the inmates couldn't get along. Fandel wrote back to Lindell, thanking him for bringing the matter to her attention and letting her know that he had not been satisfied by how he and Gallup had seemed to resolve the dispute. She added that she understood his complaint and that she shared the concern with Moreno.

About a week after the incident, Fandel was in one of the prison's dayrooms. Lindell came down the stairs and looked at Fandel. Fandel says that she perceived the look as "hostile . . . . like he was saying, 'you are my enemy' and [making her] feel like she could not deescalate his feelings toward her after this point." Dkt. 45, ¶ 90. Lindell says that his look was meant to convey disappointment at her allowing Gallup's offensive statements in class.

The next day, Lindell sent Fandel an electronic message, stating, "You have a job to do, and I respect that. But, the reason for my look when you were on my unit the other day, it offends me that I had to be the person to say something [about Gallup] . . . . Dkt. 46-1, at 2–3. He added, "We don't need to be told how to conduct ourselves; we expect serious consequences for making intentionally offensive remarks." *Id.* at 3.

Fandel wrote to Moreno and others stating that she had gotten another message from Lindell, that Lindell "gave [her] a hostile look," and that she wouldn't be responding. Dkt. 46-3, at 18. In a follow-up email, Fandel stated, "I'm feeling really jaded. I absolutely regret giving him the chance to be in the editorial group. I'm trying to let this be a learning experience, but right now I just feel angry and manipulated." *Id.* at 17. Moreno responded,

5

stating, "[I] think it's time to cut Lindell off completely. Hostile looks are not ok ever. Also, his email suggests he is contemplating some kind of retaliation against his enemies and contains a not-so-veiled threat of violence (we expect serious consequences for making intentionally offensive remarks)." *Id.* at 17.

Fandel wrote to corrections defendants Kennedy and Churchill about receiving a hostile look from Lindell and stating that his newest complaint about Gallup wasn't what their argument in class had been about. She stated, "I am done with editorial group for the semester. We are looking into suspending Lindell's [electronic message] account so he can have no further communication with me. Would you be able to help ensure that he has no more personal contact with me?" *Id.* at 13. Kennedy responded, supporting Fandel's suggestion to cancel the editorial group and suspending Lindell's electronic messaging access. He added, "Lindell will not be scheduled into any classroom whose space and timing coincides with current and future Odyssey Beyond Bars programming, and he will have no reason to contact you personally. Please report any personal contact, online or in-person, if it occurs." *Id.* at 12. Kennedy dissolved the editorial group and barred Lindell from having in-person contact with UW education staff. The parties dispute whether Kennedy completely barred Lindell from OBB programming, but I infer from Lindell's restriction on contact with UW staff that he was at least de facto banned from that programming. I also infer that Lindell was banned from being in the education building the one day a week that Fandel was there.

Lindell was not barred from other programming, such as courses offered by Madison Area Technical College (MATC), but Lindell says that there were times that he had to miss an MATC class or turn in work late because he couldn't be in the education building at the same time as Fandel or other OBB staff.

In January 2023, Kennedy spoke with Lindell. Lindell says that Kennedy told him that Fandel wanted a restraining order against him but that Kennedy had talked her out of it, and that if Lindell pursued his complaint in court Fandel would accuse Lindell of threatening her. Lindell says that at some point Churchill also told him that Fandel wanted a restraining order against him.

Kennedy states that after Lindell was enrolled in MATC courses, he received complaints from MATC staff about Lindell's behavior. Kennedy had Lindell sign a conduct code regarding appropriate communication between teacher and student. Lindell states that in discussions with Kennedy and MATC staff, Kennedy referred to inmate grievances that Lindell had filed and his threat to sue OBB staff.

In summer 2023, Fandel was in the education building preparing for class when Lindell started to walk into the room. The parties dispute exactly what was said. Fandel says that Lindell asked her if she preferred he not enter and she responded that she was "fine with it," even though she was actually uncomfortable with the situation. Dkt. 45, ¶ 131. Lindell says that he told her, "I was told that you don't want me around you," and Fandel responded "in a shocked tone," saying, "I never said that I didn't want you around me. Who said that?" Dkt. 103, ¶ 23.

Later that summer, defendant Churchill requested that Lindell be permitted in the education building even when Fandel was present, so that Lindell could better participate in MATC programming. Fandel met with defendant Deputy Warden Glass; Fandel stated that she was willing to be in the same building as Lindell but was unwilling to work with him in a teacher-student capacity. Glass decided to continue barring Lindell from being in the education building while Fandel was there.

I will discuss additional facts as they are relevant to the analysis.

ANALYSIS

Lindell alleges that defendants retaliated against him for making complaints, particularly about being harassed by inmate Gallup during Fandel's class.

The following retaliation claims remain in the case:

- Defendants Fandel and Moreno removed Lindell from the OBB program and its editorial group, with defendant Kennedy's approval.

- Defendant Kennedy, and later defendants Moreno and Glass, forbid Lindell from communicating with OBB staff and students and excluded him from various areas of CCI's educational building.

- Defendants Kennedy and Churchill, and later Glass, falsely reported that Fandel wanted a restraining order against him.

- Defendant Kennedy told MATC staff to ignore any grievances or complaints raised by plaintiff.

- A claim for injunctive relief against Moreno to ensure that he is no longer denied involvement in educational programming.

## A. Removal from OBB program

I'll start with Lindell's allegation that defendants Fandel, Moreno, and Kennedy retaliated against him for complaining about Gallup's harassment by removing him from the OBB program, including the editorial group.

To win a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) the defendant took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in the defendant's decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

8

I'll assume that Lindell's complaints were First Amendment-protected activity. Defendants argue both that removal from the program wasn't significant enough of a deprivation to deter future First Amendment activity, and that his complaints weren't a motivating factor in their decision. The parties dispute exactly what opportunities Lindell missed out on by his exclusion from the program given that he could partake in other educational programming, but I need not address this prong of the test, because I conclude that Lindell's claim fails on the causation element.

Lindell contends that he was removed from the OBB program as retaliation for him complaining about Gallup's harassment. But the evidence linking his removal to his complaints is extremely tenuous. Although Lindell's electronic complaint to Fandel (and other previous complaints to Fandel) were part of the sequence of events leading up to his removal, that removal didn't directly follow Lindell's complaint. Rather, the decision to remove Lindell from the program was made only after the incident in which Lindell glared at Fandel; Fandel says that this unsettled her and made her believe that she could no longer have a teacher-student relationship with Lindell. Also, Moreno noted that Lindell's discussion of "serious consequences" for inmates who make offensive remarks suggested that Lindell was threatening violence against Gallup. Those would be legitimate, non-retaliatory reasons to remove Lindell from the program. In considering a retaliation claim, I must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (internal quotations and citations omitted); *see also Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (citing *Babcock*).

Given that defendants have proffered legitimate reasons for punishing Lindell, it is his burden to produce evidence that defendants' proffered reasons are "pretextual or dishonest." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). Lindell fails in this task. He notes the timing of his removal, but suspicious timing alone is rarely sufficient to establish a genuine issue of material fact for trial over a party's retaliatory motive. *See, e.g., Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644. And if anything, the timing here benefits defendants. Defendants didn't remove Lindell immediately after his complaint to Fandel; he was removed only after the incident in which he glared at Fandel.

Lindell also argues that defendants favored Gallup and made him a "poster child" or "pet" for the OBB program despite Gallup's alleged harassment by featuring him in a UW newsletter about the program, and despite Lindell being a model student. *See* Dkt. 87-47, at 1–4. This is extremely thin evidence that defendants preferred Gallup to Lindell at all, but even if they did prefer Gallup personally, that doesn't come close to showing that Lindell's removal from the program was done to retaliate against him for complaining about Gallup.

Lindell says that his "look" at Fandel wasn't hostile, and that it was meant only to convey disappointment with how she handled Gallup's harassment. If Fandel were merely mistaken about Lindell's intentions, that doesn't show the pretext necessary to overcome defendants' assertion of a legitimate reason for his removal. *Cf. Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016) ("it was the employer's motive, and in particular the facts as the employer reasonably understood them, that mattered."). Lindell suggests that Fandel lied about his glare being hostile, stating that other aspects of her emails to UW and prison staff were also dishonest. He says that she lied by telling others that Lindell's account of the "systemic racism discussion . . . . is not what Lindell was attacking [Gallup] about last week." Dkt. 46-3, at 18.

This appears to be at most a difference of opinion about the main thrust of Lindell's initial electronic message to Fandel, but in any event, it simply wouldn't lead any reasonable jury to conclude that Fandel lied about feeling unsettled by Lindell's glare, and that the purpose of that lie was to retaliate against Lindell for complaining about Gallup. I will grant defendants' motions for summary judgment on this claim.

## B. Exclusion from building and communications

Lindell alleged that Kennedy, Moreno, and Glass forbid him from communicating with OBB staff and students and excluded him from various areas of CCI's education building. The parties' summary judgment materials clarify these claims: I no longer take Lindell to be alleging that he was forbidden from communicating with other prisoner students. It is undisputed that he was removed from the OBB's electronic messaging system and that he couldn't use the education building while Fandel was there. This claim has the same problem as Lindell's claim about removal from the program: defendants had a legitimate reason to limit his contact with Fandel, and Lindell doesn't provide evidence that could lead a reasonable jury to doubt that rationale.

There is an added component to this claim because Glass is included as a defendant. Glass wasn't involved in the initial decision to bar Lindell from the education building when Fandel was present, but in July 2023 he rejected Churchill's proposal to allow Lindell in the building when Fandel was present. Glass states that he kept this bar in place for Fandel's safety and wellbeing, even though Fandel was receptive to rescinding the bar (although she was adamant that she not teach him again). Whatever the merits of Glass's decision, the record doesn't contain any evidence suggesting that Glass made it to retaliate against Lindell for

11

making a complaint against Gallup over six months prior. So defendants are entitled to summary judgment on this claim.

## C.  Comments about restraining order

Lindell alleges that defendants Kennedy, Churchill, and Glass falsely told him that Fandel wanted a restraining order against him. Defendants deny that they told Lindell this, but because defendants move for summary judgment I must credit Lindell's account. However, even assuming that defendants made this statement, Lindell does not explain how the statement, in itself, could dissuade a person of ordinary firmness from raising complaints in the future. If what Lindell means is that Kennedy and Churchill falsified a reason to bar him from the education building when Fandel was there, the undisputed facts show that this is incorrect. Kennedy barred Lindell from the education building because Fandel explicitly asked them "to help ensure that [Lindell] has no more personal contact with [her]." Dkt. 46-3, at 13. So while Fandel didn't actually seek a formal restraining order in a court, she did ask to be kept separate from Lindell. Incorrectly calling that a request for a restraining order did not affect the restrictions placed on Lindell.

Lindell states that in summer 2023 he spoke with Fandel, who was now willing to be in the same building as Lindell, yet the restriction remained in place. That decision was made by Glass, who was aware of Fandel's changing feelings on the matter yet he kept the restriction in place anyway. I've already concluded that there's no evidence that Glass's decision was meant to retaliate against Lindell for his complaints. And there isn't any evidence that alleged false statements about Fandel wanting a restraining order had anything to do with that decision. I will grant summary judgment to defendants on this claim.

### D. MATC grievances

Lindell also alleges that as he took other educational programming through MATC, defendant Kennedy told MATC staff to ignore his complaints because he was prone to filing them. Defendants argue that Lindell submits no admissible evidence supporting this allegation or suggesting that MATC staff followed through on Kennedy's suggestion.

Lindell barely discusses this claim in his summary judgment materials. He cites to a portion of his original complaint containing this passage:

> upon information and belief, Kennedy soured Lindell's dealings with M.A.T.C. officials by informing them that Lindell had threatened to sue O.B.B. personnel, which resulted in M.A.T.C. staff member Lisa Wiese refusing to assist Lindell resolve a conflict with a M.A.T.C Writing instructor and unjustifiably accuse Lindell of misconduct when Lindell pursued a grievance about that Writing instructor and Ms. Wiese's refusal to help resolve the matter --Kennedy set up a potential conflict with M.A.T.C., then played along with it (even, on 14 March 2023, informing Ms. Wiese that Lindell had filed a LC. about Kennedy, in violation of Wis. Admin. Code ssDOC 310.16(1)) as a continuation of his effort at training Lindell not to pursue grievances about Education Department associates.

Dkt. 1, at 9. Because Lindell's complaint is verified, I take him to be relying on this allegation as evidence in support of his claim, along with prison "Interview/Information Request" forms attached to his complaint that provide more detail about his interactions with Kennedy and MATC officials. Dkt. 1-1, at 43, 55, 107–112.

This evidence and other emails between Kennedy and Fandel or MATC staff suggest that Kennedy did mention to UW and MATC staff grievances that Lindell had filed and his threat to sue the OBB program. Lindell states that disclosing this information to non-DOC staff violated DOC regulations. But even if that is true, violation of a prison regulation in itself doesn't violate the Constitution. *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). And

mentioning particular grievances or a threat to sue does not raise a reasonable inference that Kennedy directly told MATC officials to disregard complaints that he filed to MATC staff, or even that Kennedy implied that MATC should do so.

Lindell believes that Kennedy had this motive, but courts often observe that summary judgment requires the party with the burden of proof to "put up or shut up," pointing to evidence from which a reasonable jury could find in its favor of each element of its claim. *See, e.g., Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). Lindell's supporting evidence doesn't show that Kennedy urged prison officials to disregard Lindell's complaints, much less that MATC officials took adverse action against him because of Kennedy's statements. His mere speculation about what Kennedy meant or what motivated MATC officials' actions is not enough to create genuine disputes of material fact. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Because Lindell cannot succeed on his retaliation claim about these allegations, I will grant summary judgment to defendant Kennedy on this claim.[1]

### E.  Claim for injunctive relief

Lindell also brings a claim for injunctive relief against defendant Moreno to ensure that he is no longer denied involvement in educational programming. Dkt. 18. But because I am granting summary judgment to defendants on all of Lindell's underlying claims of retaliation, his claim for injunctive relief to stop that retaliation fails as well.

---

[1] Defendants also contend that they are entitled to qualified immunity. Because I am dismissing Lindell's claims on the merits, I need not consider defendants' qualified immunity arguments.

REMAINING ISSUES

There is a remaining dispute regarding a discovery issue raised by Lindell, which I've already concluded came too late to affect the parties' summary judgment submissions but that I will address here. Lindell asked the UW defendants for their social media handles so that he could investigate their postings. The UW defendants objected to that request, and then in their brief opposing Lindell's motion to compel they stated that they made no social media postings about Lindell's claims. The court granted Lindell's motion to compel on that issue, but didn't force the UW defendants to turn over their handles; rather, the court stated that the UW defendants must supplement their formal discovery response to include the statement from their brief that they have not posted on social media about Lindell's claims. Dkt. 129, at 4. Lindell now moves again to compel the UW defendants' social media handles, Dkt. 133, but defendants' supplemental response to that request shows that they complied with this court 's order by stating that they haven't posted anything about Lindell's claims, Dkt. 134-1, at 2. Because the UW defendants have complied with the court's instruction on supplementing their discovery response, I will deny Lindell's motion to compel.

Non-party Brianna Burton, a freelance journalist, moves for reconsideration of my order denying her motions to intervene in the case and to record proceedings. Dkt. 95 (my order); Dkt. 125 (Burton's motion). Lindell joins in that motion. Dkt 127. Although Burton's motion is arguably moot because I am dismissing the case, I will address her request because she seems likely to seek intervention in additional cases.

I will deny Burton's motion for reconsideration because she hasn't explained how anything in my previous ruling was incorrect. Burton doesn't seek to intervene in the traditional sense; that is, she doesn't have a cause of action or defense to join in the lawsuit.

15

Rather, she wants to be able to observe and record proceedings, citing the First Amendment and cases in which courts have suggested that intervention is appropriate for media outlets to challenge the sealing or withholding of case-related information. *See, e.g.*, *United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010); *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994). But Burton doesn't seek to unseal particular information; she wants access to hearings and to record them. As I stated in my previous order, she may request access to hearings; she doesn't need to intervene to do that. But she may not record court proceedings: the Judicial Conference of the United States prohibits the recording of district court proceedings for public dissemination.[2]

ORDER

IT IS ORDERED that:

1. Plaintiff's motions to submit additional evidence and a sur-reply brief, Dkt. 130 and Dkt. 131, are GRANTED.

2. Plaintiff's motions for sanctions, Dkt. 135, is DENIED.

3. Defendants' motions for summary judgment, Dkt. 43 and Dkt. 51, are GRANTED.

4. Non-party Brianna Burton's and plaintiff's motions for reconsideration regarding intervention, Dkt. 125 and Dkt. 127, are DENIED.

5. Plaintiff's motion to compel discovery, Dkt. 133, is DENIED.

6. Defendants' motions to stay the schedule pending a summary judgment ruling, Dkt. 137 and Dkt. 138, are DENIED as moot.

---

[2] https://www.uscourts.gov/sites/default/files/guide-vol10-ch04.pdf.

7.  The clerk of court is directed to enter judgment accordingly and close the case.

Entered March 13, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge